# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 21, 2012

## STATE OF TENNESSEE v. COLIN D. SAVAGE

**Appeal from the Circuit Court for Montgomery County**
**No. 40900019      Michael R. Jones, Judge**

_____

**No. M2011-00666-CCA-R3-CD - Filed September 17, 2012**

_____

After pleading guilty to the indicted charges of conspiracy to commit aggravated burglary, aggravated burglary, conspiracy to commit theft of property valued at $10,000 or more, and theft of property valued at less than $500, appellant, Colin D. Savage, was tried and convicted on the remaining charges of especially aggravated robbery and especially aggravated kidnapping. The trial court merged the convictions for conspiracy to commit aggravated burglary and conspiracy to commit theft of property valued at $10,000 or more and sentenced appellant to four years in confinement. The court pronounced a six-year sentence for the aggravated burglary conviction, twenty-four years for the especially aggravated robbery conviction, twenty-four years for the especially aggravated kidnapping conviction, and eleven months and twenty-nine days for theft of property valued at less than $500. The trial court ordered that the sentences for especially aggravated robbery and especially aggravated kidnapping run consecutively to each other, with the remaining sentences running concurrently with them, resulting in an effective sentence of forty-eight years. Appellant filed a timely notice of appeal and claims the following errors: (1) the State's evidence was insufficient to support the convictions; (2) the trial court erred in declining to merge the convictions for especially aggravated robbery and especially aggravated kidnapping; and (3) the trial court erred in ordering the sentences to be served consecutively. After reviewing the record for sufficiency of the evidence, consecutive sentencing, and propriety of the trial court's refusal to merge the convictions, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

B. Nathan Hunt (on appeal), Edward DeWerff and Gregory D. Smith (at trial), Clarksville, Tennessee, for the appellant, Colin D. Savage.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Robert Nash, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Facts from the Trial Court

Following the entry of guilty pleas to four counts of the Montgomery County indictment, appellant's two-day trial for especially aggravated robbery and especially aggravated kidnapping began on August 16, 2010, resulting in jury verdicts of guilty on both counts. The trial court sentenced appellant to an effective forty-eight year sentence. The court heard appellant's motion for new trial on February 25, 2011. At the conclusion of the hearing, the trial court denied the motion. This appeal follows.

The ninety-two-year-old victim, Ms. Oma England, testified that she fell asleep early in the afternoon on October 14, 2008. She awoke to someone jumping up onto her bed. Ms. England tried to get up, but the person held her down. The individual began to pull her hair and suffocate her. She could not catch her breath and was in great pain. As Ms. England was fighting the attack, the individual found some sort of fabric and wrapped each of her fingers. He made a knot of the binding and tied her to the bed. She believed there were two or three attackers in her room. She did not recall who initially found her.

The State first tried Rodney Glover for his involvement in the crimes. The jury found him guilty of aggravated kidnapping, aggravated burglary, conspiracy to commit aggravated burglary, and conspiracy to commit theft valued at $10,000 or more. At the time of appellant's trial, Mr. Glover was awaiting sentencing. Mr. Glover testified at appellant's trial that he met appellant through a mutual friend a few months prior to the crimes. Mr. Glover and another friend, John Privett, began planning the incident approximately one month in advance. Mr. Privett knew the victim because she was his wife's stepmother. Mr. Privett convinced Mr. Glover that he would realize $100,000 to $300,000 in cash during the burglary if they could locate certain bank account numbers, gold bars, silver bars, $30,000 in cash, jewelry, guns, and miscellaneous items located within the residence.

Mr. Glover further testified that he and appellant both lived in Georgia at the time they committed the offenses and that their residences were in view of each other. Mr. Glover visited appellant on the day of the incident and explained to appellant that he planned to burglarize the victim's home in Clarksville, Tennessee. Appellant requested that they tell his girlfriend about the plan, as he needed to obtain permission from her first. After speaking

with appellant's girlfriend, Mr. Glover and appellant began to travel toward the victim's home. They planned to gain entry into her home through the back door. They knew the victim would be at home. Mr. Glover and appellant discussed appellant's tying up the victim after they entered her home.

Once in Clarksville, Mr. Glover realized the directions Mr. Privett gave him to the victim's home were incorrect. Mr. Glover called Mr. Privett to obtain better directions but did not reach him immediately. Mr. Glover and appellant passed the time, waiting for Mr. Privett to return Mr. Glover's call. After receiving directions from Mr. Privett, Mr. Glover and appellant drove to the victim's home, then drove around to find a place to conceal the truck. Appellant decided to leave the truck in a used car lot. The two men then left on foot toward the victim's home but became separated for a time on the way.

When Mr. Glover reached the victim's home, he circled to the rear of the house and raised a window in the sunroom. He reached inside the window and unlocked the door to gain entry. He descended the stairs to the basement, searching for the items that Mr. Privett assured him he would find. Mr. Glover located the safe, but it contained old pennies, stamps, and coins, not the cash, gold and silver Mr. Privett had touted. Mr. Glover gathered all of the items and placed them in the middle of a flag that he had spread out on the floor. He used the telephone in the victim's home to call appellant. When appellant answered, Mr. Glover told him to come to the back door. The State obtained telephone records that confirmed Mr. Glover's account of the calls that he placed to appellant's telephone from the victim's home telephone number. Following the telephone calls, Mr. Glover noticed some rings on the kitchen counter and put them in his pocket.

Mr. Glover testified that after appellant entered the victim's home, appellant proceeded downstairs. He began to sort through the items Mr. Glover had located. Mr. Glover informed appellant that "it's not there," meaning the cash, gold and silver. On the way out of the basement, Mr. Glover and appellant rummaged through the dresser drawers that they saw. They passed through a small room from which appellant took a nightstick and electrical cords. Mr. Glover and appellant started to walk up the stairs when they noticed a closet. They removed a small fox fur coat and a full length mink coat and placed the coats in the pile of items they intended to take from the victim's home. After reaching the main floor, Mr. Glover and appellant decided that they needed to proceed upstairs to secure the victim.

Mr. Glover had removed a pillowcase from a bed in the basement. He ascended the stairs toward the top floor ahead of appellant. Mr. Glover placed the pillowcase over the victim's head. Appellant bound her feet with the electrical cord. Mr. Glover attempted to bind the victim's hands but could not do so. He then held the victim's hands together while

appellant bound them. Mr. Glover began to open the victim's night stand when he heard the victim call out for Jesus. The victim was sitting on the bed. The next sounds he heard were two knocking sounds. When Mr. Glover turned around, he witnessed appellant standing over her with the nightstick in his hand. The victim fell backward onto the bed. Appellant removed the .25 caliber gun from his pocket and rubbed it on the victim's leg. He threatened the victim that he would use the gun if she did not remain quiet. Appellant "tied the victim's hands over her head to the bedpost."

After binding the victim, appellant took the victim's jewelry box and her purse. He began to fill his pockets with items from the jewelry box and purse. During the struggle, Mr. Glover knocked the telephone off of the victim's bedside table. When the telephone landed on the floor, the receiver fell off of the cradle. Soon, Mr. Glover heard "Life Support" through the receiver. When the caller asked for Ms. Oma England, Mr. Glover disguised his voice as an elderly person and told the caller that everything was okay. Appellant anxiously urged Mr. Glover to leave, saying that "Life Support" would dispatch fire trucks, police, and paramedics to the residence. Mr. Glover assured appellant that he had the situation under control.

Appellant then grabbed one or two jewelry boxes and the victim's purse and ran down the stairs. He exited through the kitchen door. Mr. Glover did not see whether appellant had the nightstick and gun with him when he left. Mr. Glover was confident that "Life Support" would not be dispatching emergency responders, so he began to search for and gather other items to take. Mr. Glover remained in the residence an additional thirty minutes to one hour. At some point, appellant returned and informed Mr. Glover that he could hear sirens. Appellant left again. Mr. Glover packed up all of the items that he had gathered, then went into the dining room to gather the silver. He loaded everything into the victim's car and left the residence. He drove around for approximately an hour, calling out of the window for appellant. When he left the neighborhood to drive back to Georgia without appellant, Mr. Glover believed it was 2:00 a.m.

Mr. Glover stole the following items from the victim: a long mink coat, coins, stamps, silver, pottery, a twelve-gauge shotgun, a .22 caliber rifle, several items of jewelry, and $7-8 in cash. Mr. Glover asserted that he was not responsible for the ransacking of the victim's home. He testified that the State did not offer him any benefits in exchange for his testimony at appellant's trial and that he testified on his own volition because he felt that appellant was attempting to assign full responsibility to him.

Ben Blackmon, an officer with the Clarksville Police Department, was on duty on October 15, 2008, when he was dispatched to 105 Talton Court. The complainant, Ms. Vickie Terrell, requested that Officer Blackmon investigate the residence at that address.

-4-

Officer Blackmon observed an open garage door, and together with Officer Quinn, decided to enter the residence. Upon entering the foyer, Officer Blackmon saw that the house was in extreme disarray. Pictures were knocked from walls, furniture was overturned, and papers littered the floor. After proceeding through the kitchen, the officers noticed stairs leading to the basement. The basement rooms were in similar disarray; a mattress was removed from a bed, furniture was overturned, and drawers had been pulled out of dressers. The officers then returned to the main floor of the home and began to ascend the stairs leading to the top floor of the residence.

After clearing a bathroom, Officer Quinn looked in one of the bedrooms and advised Officer Blackmon that there was a body in the room. For their safety, the officers cleared the remaining rooms of the home before returning to the bedroom. The officers initially assumed the person was deceased but observed the victim move her foot. They attempted to render aid. Officer Blackmon saw that the victim's hands were bound to the headboard of the bed and that her feet had been tied to the footboard using electrical cords. The victim also had a pillowcase over her face.

Pursuant to Officer Blackmon's instructions, Officer Quinn removed the pillowcase from the victim's face and made contact with the victim. Officer Blackmon observed that the victim's face was extremely bruised and that her eyes were swollen. One of her wrists was disfigured and appeared to be broken. Officer Quinn left the area to retrieve a knife from the patrol car so that Officer Blackmon could cut the victim free from her restraints. The officers then requested Emergency Medical Services ("EMS") and contacted their supervisor.

Officer Blackmon asked the victim how long she had been restrained. She did not know whether it was day or night and could not give officers a time frame. She did not know who her assailants were. She had been afraid to call out, fearing that the offenders would return. At that time, the victim believed that one individual was responsible for the crimes.

Vickie Terrell, who was employed by the victim at the time of the attack, testified that she cleaned the victim's home and drove her to various appointments. Ms. Terrell had worked for the victim for approximately four years. Before the incident, Ms. Terrell worked one day a week. She began working for the victim five days a week after the incident. Ms. Terrell was scheduled to work on the day following the incident, October 15, 2008. She knew immediately when she drove up to the residence that something was amiss because the garage door was closed. The victim always opened the garage door and sometimes pulled her car out of the garage when she was expecting Ms. Terrell. Upon opening the garage door, Ms. Terrell observed that the victim's car was missing and objects in the garage were strewn about. Ms. Terrell opened the door into the house and called out for the victim twice.

She observed that the home was out of order, so she remained outside and called 9-1-1. Officers responded to her call. Ms. Terrell did not enter the house for several days after the attack. When she finally went inside, she found a cigarette butt tossed in the entryway behind the stairway corner. She gave the butt to Nancy Williams, the victim's daughter. No one smoked inside the victim's home. Ms. Terrell was a smoker but had never smoked inside the victim's home.

Barry Spencer of the Montgomery County EMS responded to the residence at 105 Talton Court at approximately 9:00 a.m. on October 15, 2008. Upon entering the upstairs bedroom, Mr. Spencer observed a ninety-two-year-old female on the bed, wearing only her underwear. Officers had freed her from her restraints. Mr. Spencer noticed multiple areas of swelling on her face. The victim appeared to be alert. EMS initiated treatment by immobilizing the victim's spine and inserting an IV through which they could administer pain medication.

Mr. Spencer stated that the victim seemed scared. She repeatedly asked who everyone was and what they were doing in her home. After she was immobilized, the victim complained of pain in her forearms and hands. The bindings with which the victim was tied had left indentations in the victim's skin in those areas. The victim told Mr. Spencer that someone jumped on her during the night and beat her. EMS transported the victim to Gateway Medical Center.

Dr. Robert Paasche, a board-certified emergency medicine physician, received the call from EMS that they were transporting a victim of a home invasion to the emergency room. When Dr. Paasche first encountered the victim, he noticed that she had been severely beaten and had sustained bruising and swelling around both of her eyes to the degree that they were almost swollen shut. The victim also presented with severe swelling, bruising, and tenderness on both hands. The victim complained of chest pain as a result of injuries to her chest. Based on his observations, Dr. Paasche was very concerned that the victim may have had a life-threatening condition. He ordered several laboratory tests and images. The staff monitored her heart closely.

"CK" is an enzyme that represents heart muscle protein. The victim's "CK" level was approximately ten times the normal value. Dr. Paasche was concerned that because the victim remained in one position for a very long period, her body may have digested a large portion of her muscle and deposited the protein into her body. A high level of protein can overwhelm the kidneys and result in kidney failure.

As Dr. Paasche examined the victim, she expressed that she had significant pain in her head and face, as well as her hands, wrists, and chest. He treated her pain conservatively

-6-

with narcotic pain medication because he did not want to alter her mental state and confuse her. The victim also complained of nausea, which the doctor treated with multiple rounds of anti-nausea medication.

The victim's injuries included a sub-conjunctival hemorrhage (bleeding to the white part of the eye), an orbital blow-out fracture (a broken bone on the underside of the eye orbit which holds the eye in place), a fracture of the left distal radius (broken bone in the wrist), and a displaced left fifth metacarpal (a severely broken bone of the hand by the smallest finger). Dr. Paasche opined that the injury to the orbit was severe, represented a very significant amount of force and almost always required surgical repair. The victim also suffered a concussion. The injury to the victim's chest did not appear to be as severe as her other injuries. However, in an elderly patient with limited lung reserve, an injury even without a broken bone could cause the individual to take shallow breaths, presenting a risk of pneumonia.

William Barnes was a patrol sergeant and crime scene investigator with the Clarksville Police Department. He responded to the residence at 105 Talton Court on October 15, 2008, and assisted in collecting evidence. He collected a cigarette butt from the top of the dryer and a latex glove from the top of the washing machine, both located in the victim's laundry room. Sergeant Barnes took photographs and produced a videotape of the crime scene. During the investigation, he processed a truck in which he found a Pepsi bottle.

Special Agent Jennifer Shipman was a Special Agent Forensic Scientist in the DNA and serology division of the Tennessee Bureau of Investigation Crime Lab. Special Agent Shipman extracted human DNA from the cigarette butt retrieved by Sergeant Barnes. The DNA profile from the cigarette butt matched Rodney Glover's DNA profile. The probability of an unrelated individual having the same profile exceeded the current world population. Special Agent Shipman also tested the latex glove recovered by Sergeant Barnes in the victim's laundry room. Presumptive tests did not indicate the presence of blood, but she successfully swabbed the glove and collected DNA. Testing indicated a partial profile which was consistent with appellant's DNA profile. The probability of an unrelated individual in the African American population with the same genetic profile is one in 104,500.

Gary Hodges, now retired from the Clarksville Police Department where he was a criminal investigator, collected additional evidence from the crime scene. Investigator Hodges recovered a pair of latex gloves from the center bedroom of the victim's home. That was not the bedroom in which the victim was found. Investigator Hodges assisted Officer Barnes in processing the truck, which he identified as a white Ford F-250 model. Investigator Hodges also found two Pepsi bottles in the truck, as well as three cigarette butts.

Special Agent Shipman matched DNA swabbed from the mouth of the two Pepsi bottles to Rodney Glover's DNA. The probability of an unrelated individual having the same profile exceeded the current world population. She tested one of the latex gloves found upstairs in the victim's home and obtained a partial profile matching Rodney Glover. The probability of an unrelated African American individual having the same DNA profile is one in 13.8 billion. Special Agent Shipman tested two cigarette butts found in the white Ford truck. She designated them number one and number two. The DNA profile from number one matched Rodney Glover, and the DNA from number two matched appellant; for both profiles, the probability of an unrelated individual having the same profile exceeded the current world population.

Samuel Knolton, also from the Clarksville Police Department, was an instructor with the training division and worked with crime scene investigations at the time of the offenses. He responded to 105 Talton Court to recover evidence on October 15, 2008. As part of his duties, Officer Knolton recovered several pieces of extension cord or appliance wires at the crime scene. He provided photographs depicting the victim's bedroom and the exact locations where he found the cords and wires. Near the bed, Officer Knolton recovered the pillowcase that was placed over the victim's head.

Sergeant Liane Wilson worked in the Major Crimes Division of the Clarksville Police Department on October 15, 2008. When she responded to the crime scene, Sergeant Wilson was directed to follow the victim to the hospital. At the hospital, Sergeant Wilson received the shirt that the victim had been wearing. A couple of days later, she obtained a cigarette butt from the victim's daughter, Nancy Williams. Sergeant Wilson photographed the victim while she was in the hospital.

Special Agent Shipman tested the cigarette butt that Sergeant Wilson received from Ms. Williams. The DNA profile matched appellant. The probability of an unrelated individual having the same profile exceeded the current world population.

Detective Brad Crowe with the Clarksville Police Department Criminal Investigations was assigned to investigate the crime scene in this case. He responded to Hodges Brothers Auto Sales, where officers located the truck. Detective Crowe removed the license plate from the truck. He collected fingerprints and took photographs depicting the fingerprints. Detective Crowe recovered a business card from the truck. He provided a photograph of the vehicle identification number from inside of the truck, as well as photographs of the Pepsi bottles and the cigarette butts.

Special Agent Suzanne Lafferty is a Special Agent Forensic Scientist in the Latent Print Unit of the Tennessee Bureau of Investigation Crime Lab. She received latent prints

from the Clarksville Police Department that had been lifted from the white Ford F-250. Special Agent Lafferty identified two of the prints as the right thumb of Rodney Glover.

Detective Tim Finley of the Clarksville Police Department was the lead detective on this matter. As he began to investigate possible suspects, Detective Finley initially considered the victim's caretakers. Following discovery of the truck at Hodges' Brothers Auto Sales, detectives learned that the truck was stolen from Jonesboro, Georgia. Detectives ascertained that the victim's stepdaughter, Nancy Privett, lived in that area. The officers then developed Mr. Glover and appellant as suspects. Detective Finley traveled to Georgia where he interviewed appellant while another detective questioned Mr. Glover in another county. During the interview, appellant referenced a white vehicle, a Mercury Milan, that he believed Mr. Glover drove. The Mercury Milan was registered to the victim.

Detective Finley recovered several items of the victim's property at appellant's home. He identified the box of gold flatware, which he found buried next to a shed on appellant's property. He also found two purses, a 1971 coin proof set, and a scarf buried in a hole beside the shed. In the same area, Detective Finley discovered an ammunition can and a black garbage bag. He also found jewelry that the victim's daughter identified as belonging to the victim. Detective Finley recovered the nightstick at the home of Teresa Harley, an individual with whom Mr. Glover resided in Jackson, Georgia. Detective Finley obtained the DNA swabs from Mr. Glover and appellant.

Special Agent Shipman tested the nightstick for DNA. Preliminary tests failed to indicate the presence of blood. She swabbed the grip and the other end of the stick for DNA. Tests indicated the presence of DNA; however, despite obtaining a partial profile, the test results were inconclusive due to insufficient or degraded DNA.

Sergeant Alan Charvis of the Clarksville Police Department assisted Detective Finley, the primary investigator, in collecting evidence from the victim's residence. He located a piece of a latex glove on the steps coming from the kitchen.

Special Agent Shipman tested the piece of the latex glove. Based on her testing, Agent Shipman obtained a partial profile that matched appellant's DNA profile. The probability of an unrelated individual having the same DNA profile exceeded the current world population.

Nancy Williams, the victim's daughter, lived in Baton Rouge, Louisiana. Prior to the incident, she visited her mother every two or three months. Upon learning of the attack upon her mother, Ms. Williams immediately flew to Clarksville and proceeded directly to the hospital. Ms. Williams observed that her mother's face was badly beaten and bruised. Her

-9-

hands and wrists were also injured. The victim remained in the hospital for approximately one week before being transferred to the rehabilitation section of the hospital, where she was treated for five to six weeks. Prior to sustaining the injuries associated with the attack, the victim could walk; she is now wheelchair-bound. Ms. Williams identified several items of the victim's jewelry. She also identified her father's captain's bars and a medal with coordinating tie tack but was unsure about the paratrooper pin, the eagle pin, or the rifle. Ms. Williams recognized her father's 1971 coin collection, her mother's scarf and evening bag, and a set of gold flatware that Ms. Williams gave to her mother as a gift.

Joseph DeMaio testified that he was an inmate at the Montgomery County Jail at the same time that appellant and Rodney Glover were incarcerated. He was in jail pending disposition of a theft charge, which resulted in probation. Mr. DeMaio received no leniency from the State in exchange for his testimony in Mr. Glover's and appellant's cases.

Mr. DeMaio's first contact with Mr. Glover was in September or October, 2009. Mr. DeMaio was bitten by a spider and while his wound healed, he was transferred to the medical pod at the jail for about ten days, where he met Mr. Glover. During their stay, Mr. Glover spoke to Mr. DeMaio about the crime Mr. Glover had planned with John Privett and committed with another person. Mr. Glover asked Mr. DeMaio to search the internet for information about Mr. Privett's charges and convictions. At some point, Mr. DeMaio asked Mr. Glover why everyone in the pod loathed him. Mr. Glover responded that it was because of what had happened at the victim's home. Mr. Glover spoke to Mr. DeMaio in detail, explaining that he and another man (whom he did not name) were inside the victim's home looking for a Hitler stamp that was supposedly very valuable. They were also looking for money, gold, and silver. Mr. Glover chronicled the events of the evening, including information about where they parked the truck and how the two men separated after they parked the truck. Mr. Glover further told Mr. DeMaio that he went inside the victim's home and she woke up, whereupon he tied her up with telephone cord. Mr. Glover said that he then made a telephone call to the other man to come back to the house, but when he did, the Life Alert system activated and the other man ran away. Mr. Glover admitted to remaining in the home and disguising his voice to the caller from Life Alert.

After being moved to a regular pod, Mr. DeMaio met appellant while Mr. DeMaio was playing cards. Mr. DeMaio was talking with someone else and telling him what Mr. Glover had said. Appellant overheard the conversation and told Mr. DeMaio that he was the "other person" to whom Mr. Glover referred. Appellant told Mr. DeMaio that he participated in the offenses because he owed money to some individuals for methamphetamines, and the burglary was a way to pay them back. Mr. DeMaio and appellant were in the same pod for approximately six weeks to two months. In early October 2009, Mr. DeMaio wrote a letter to appellant's attorney detailing his conversations with both Mr. Glover and appellant.

Based upon the foregoing evidence, the jury deliberated and convicted appellant on the charges of especially aggravated robbery and especially aggravated kidnapping. At sentencing, the State presented the pre-sentence report and certified copies of five felony convictions from Georgia. The trial court reviewed the Georgia felonies, and in comparing the elements of the offenses to Tennessee statutes, the court found one felony conviction. Thus, it treated appellant as a Range I offender. Appellant acknowledged responsibility for his criminal conduct, denied having struck the victim, and apologized for the injuries she received. Trial counsel advanced the argument that the trial court should merge the two Class A felonies. In pointing out that the State failed to produce any evidence supporting enhancement of the sentences, counsel asserted that the court should treat appellant's pleas of guilty as a mitigating factor because the State saved the costs of having to prove those offenses to the jury. Counsel argued in favor of a sentence requiring fifteen years for appellant to serve.

The trial court first addressed the merger issue raised by trial counsel. The trial court declined to merge the offenses of especially aggravated robbery and especially aggravated kidnapping. The court found that Mr. Glover and appellant left the victim bound to her bed to die; they had no idea whether anyone would discover the victim in the near future. In so finding, the court determined that the confinement was "definitely" beyond that necessary to consummate the act of the especially aggravated robbery. The court found that the evidence established the additional factor that the confinement prevented the victim from summoning help because she was left tied to her bed. Appellant's actions also lessened the risk of detection and increased the significant danger of death or harm to the victim.

In sentencing appellant as a Range I offender, the trial court considered the evidence received at the trial and the sentencing hearing; the presentence report; the principles of sentencing and arguments as to sentencing alternatives; the nature and characteristics of the criminal conduct involved; the evidence and information offered by the parties on the mitigating and enhancing factors; statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; and appellant's statement at the sentencing hearing. The trial court also considered the minimum sentence within the range to be imposed as determined by the General Assembly to reflect the relative seriousness of the criminal offense and the length of the sentence, adjusted as appropriate by the presence or absence of mitigating or enhancement factors. The trial court found that appellant's guilty pleas were a mitigating factor. The trial court found the following enhancing factors: appellant's criminal history exceeded that necessary to establish the appropriate range of punishment, and the victim was particularly vulnerable because of age and physical disability.

After weighing the enhancement factors and the mitigating factor, the trial court sentenced appellant to four years for conspiracy to commit aggravated burglary (merged with conspiracy to commit theft of property valued more than $10,000), six years for aggravated burglary, and twenty-four years each for especially aggravated robbery and especially aggravated kidnapping. The trial court ordered that appellant serve the latter two sentences at one hundred percent. The trial court also sentenced appellant to eleven months and twenty-nine days for theft of property valued at less than $500. In ruling on consecutive sentencing, the court found by a preponderance of the evidence that appellant was an offender whose record of criminal activity was extensive and that he was a dangerous offender whose behavior indicated little or no regard to human life and he had no hesitation about committing a crime in which the risk to human life was high. The court also found that consecutive sentences reasonably related to the severity of the offenses committed. The court determined that an extended sentence was necessary to protect the public against further criminal conduct by appellant, that appellant had violated orders of probation in the past, and that appellant has continued to commit crimes. Thus, the court pronounced consecutive sentencing for the twenty-four year sentences for especially aggravated robbery and especially aggravated kidnapping, for an effective sentence of forty-eight years.

At the motion for new trial, appellant raised the issue of sufficiency of the evidence in regard to whether appellant physically assaulted the victim. In denying relief on that ground, the court found that appellant participated in the crime from the time he left Georgia until the time he entered the victim's home and was at the very least criminally responsible for the actions of his co-defendant. Appellant also addressed sentencing, arguing again that the trial court should have merged the convictions and that his sentence should be reduced by seventeen years. The trial court again found that the victim was kidnapped within the meaning of the statute and that the convictions and sentences should stand.

## II. Analysis of the Issues

### A. Sufficiency of the Evidence

Appellant argues that the State's evidence was insufficient to support the jury's verdicts. As grounds, appellant asserts that the only evidence presented by the State was the uncorroborated testimony of an accomplice. Appellant contends that the only "corroborating" evidence presented by the State supported the fact that appellant was in the victim's home, a fact that he did not dispute, and that no evidence corroborates the fact that he went upstairs to the victim's bedroom and that he was responsible for the attack on the victim.

The standard for appellate review of a claim of insufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, " we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn.1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729; *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

When criminal liability is founded upon criminal responsibility for the conduct of another, it is necessary to ascertain the sufficiency of the evidence in terms of whether the State presented corroboration of any accomplice's testimony. "[A] conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 46 S.W.3d 689 (Tenn. 2001)). Our supreme court has explained:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime

has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419.

This court reiterated, "An accomplice is defined as one who 'knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument.'" *State v. Tyree Robinson*, W2008-01001-CCA-R3-CD, 2009 WL 1741401, at *7 (Tenn. Crim. App. June 16, 2009) (quoting *State v. Griffis*, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997)), *perm. app. denied* (Tenn. Nov. 23, 2009). The pivotal inquiry into whether a witness is an accomplice rests upon "whether the witness could be indicted for the same offense as the defendant." *Id.* (citing *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990)).

In this case, there is no question that Mr. Glover was an accomplice to the offenses committed by appellant, as he was indicted, tried and convicted for offenses arising out of the incident at the victim's home. Notwithstanding Mr. Glover's status as an accomplice, viewing the evidence and all inferences drawn therefrom in the light most favorable to the State, the evidence is sufficient to support the jury's verdicts of guilt. Mr. Glover's testimony established that appellant was involved in the planning and execution of the burglary of the victim's residence. Appellant attempted to obscure the vehicle they were driving to avoid detection. Appellant entered the victim's residence and fled her home with several items of her property.

The State corroborated many points of Mr. Glover's testimony through independent evidence. TBI agents tested various articles of evidence. A cigarette butt containing appellant's DNA, found in the white Ford F-250 truck, confirmed that appellant traveled from Georgia with Mr. Glover. A latex glove with appellant's DNA, found in the victim's laundry room, corroborated appellant's presence in the victim's home. A cigarette butt containing appellant's DNA, found in the entryway in a corner behind the stairway, also placed appellant in the victim's home. The victim testified that she believed two or three attackers were involved in the offenses against her. She stated that "they came onto my body," and that while she could not see their faces, she heard "their voices." Detective

Finley found several items of the victim's property buried in a hole on appellant's property. As required by our supreme court, the DNA matches from the cigarette butts and the glove establish appellant's identity. *Bane*, 57 S.W.3d at 419. The State's evidence need not corroborate every part of the accomplice's testimony. *Id.*

Moreover, the trial court instructed the jury on accomplice testimony and criminal responsibility for the conduct of another.[1] The pattern instruction on accomplice testimony is set forth as follows:

> An accomplice is a person who knowingly, voluntarily, and with common intent with the principal offender unites with him or her in the commission of the crime. If a witness was an accomplice in the crime, then his or her testimony must be corroborated. Corroborating evidence is that evidence, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference not only that a crime has been committed but also that the defendant was implicated in it. This independent corroborative testimony must include some fact or circumstance that affects the defendant's identity. Corroborative evidence may be direct or entirely circumstantial and it need not be adequate, in and of itself, to support a conviction. It is sufficient if the corroborative evidence fairly and legitimately tends to connect the defendant with the crime charged. It is a question for the jury to determine whether an accomplice's testimony has been sufficiently corroborated.

T.P. I. - Crim 42.09 "It is well-established that jurors are presumed to follow the instructions given by the trial judge." *State v. Cribbs*, 967 S.W.2d 773, 784 (Tenn. 1998); *see State v. Laney*, 654 S.W.2d 383, 389 (Tenn. 1983); *State v. Blackmon*, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985). The jury verdicts credit the weight and value of the State's independent evidence as being sufficient to corroborate the testimony of Mr. Glover. We discern no error.

B. Merger of Especially Aggravated Robbery with Especially Aggravated Kidnapping

Appellant advances the position that, under the facts of this case, the confinement of the victim was limited to that necessary to perpetrate the offense of especially aggravated robbery, and thus does not support an independent conviction for especially aggravated kidnapping. Proof of especially aggravated kidnapping must necessarily establish that, among other factors, the offender "knowingly removes or confines another unlawfully so as

---

[1] The trial court held a jury charge conference during which it indicated to the parties its intent to instruct the jury with regard to accomplice testimony and criminal responsibility for the conduct of another. However, the jury charge is not included in the record on appeal for our review.

to interfere substantially with the other's liberty." Tenn. Code Ann. §§ 39-13-303, -305 (2010). The offense of especially aggravated robbery is completed when an offender intentionally or knowingly commits theft of property from another person by violence or by fear and does so with a deadly weapon, causing the victim to suffer serious bodily injury. Tenn. Code Ann. §§ 39-13-401, -403 (2010). Appellant argues that the confinement of the victim was limited to that necessary to perpetrate the offense of especially aggravated robbery. Relying on *State v. Dixon*, 957 S.W.2d 532 (Tenn. 1997) and its line of cases, appellant likewise argues that there is no proof of additional confinement of the victim beyond that necessary to accomplish the especially aggravated robbery. The State responds that the movement and confinement of the victim was beyond that necessary to commit the especially aggravated robbery.

Our supreme court, in *State v. Anthony*, examined "the propriety of a kidnapping conviction where detention of the victim is merely incidental to the commission of another felony, such as robbery or rape." *State v. Anthony*, 817 S.W.2d 299, 300 (Tenn. 1991). The *Anthony* court held that the proper test to decide whether the detention was incidental was "whether the confinement, movement, or detention is essentially incidental to the accompanying felony . . . or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction." *Id*. at 306.

Later, in *State v. Dixon*, the court replaced the "essentially incidental" analysis with a new two-part test:

> We must now decide whether the movement or confinement was beyond that necessary to consummate the act of [the other offense]. If so, the next inquiry is whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm.

*State v. Dixon*, 957 S.W.2d 532, 535 (Tenn. 1997) (internal citation omitted). An affirmative response to the second part of the test means that "[a] separate conviction for kidnapping does not violate due process." *State v. Richardson*, 251 S.W.3d 438, 443 (Tenn. 2008) (citing *Dixon*, 957 S.W.2d at 535).

In *State v. Richardson*, the Tennessee Supreme Court clarified the status of the law on this issue:

> The *Dixon* two-part test fully replaces the *Anthony* "essentially incidental" analysis. As we previously have observed, the *Dixon* test "provides the

-16-

structure necessary for applying the principles announced in *Anthony*." *State v. Fuller*, 172 S.W.3d 533, 537 (Tenn. 2005). Although we adhere to the due process principles adopted in *Anthony*, we now make clear that the *Anthony* analysis should not be used in conjunction with the *Dixon* two-part test. The *Dixon* test should be used exclusively in all future inquiries.

*Richardson*, 251 S.W.3d at 443 (internal footnotes omitted).

The Tennessee Supreme Court recently overruled *Anthony*, *Dixon*, "and the entire line of cases including a separate due process analysis in appellate review." *State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012). In *White*, the court addressed the application of the due process test to convictions for kidnapping and an accompanying felony. The court held:

> the legislature did not intend for the kidnapping statutes to apply to the removal or confinement of a victim that is essentially incidental to an accompanying felony, such as rape or robbery. This inquiry, however, is a question for the jury after appropriate instructions, which appellate courts review under the sufficiency of the evidence standard as the due process safeguard.

*Id.* at 562. The court concluded that our kidnapping offenses "evince a legislative intent to punish as kidnapping only those instances in which the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." *Id.* at 577. The supreme court in *White* held that "trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." *Id.* at 578. Our supreme court's ruling in *White* emphasized that it "does not articulate a new rule of constitutional law or retroactive application." *Id.* However, based on the facts of that case, the supreme court concluded that the "proof could be interpreted in different ways and, therefore, the determination of whether the removal or confinement of [the victim] constituted a substantial interference with her liberty was a question of fact for the jury." *Id.* at 579. According to the supreme court, a jury instruction requiring a "determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction" is needed to ensure constitutional due process is given to defendants charged with kidnapping and an accompanying felony. *Id.* at 578.

In *White*, the supreme court reviewed the jury charge in the trial and stated that, while the instructions tracked statutory language, "they did not define the key element - the 'substantial interference' with the victim's liberty - as requiring a finding by the jury that the

victim's removal or confinement was not essentially incidental to the accompanying felony offense." *Id.* at 580. The court held that "[b]ecause the jury was not properly instructed on the question of whether the victim's removal or confinement was essentially incidental to an accompanying felony, the Defendant is entitled to a new trial on the especially aggravated kidnapping charge." *Id.*

In order to provide guidance to trial courts, the supreme court set out the following instruction to be followed by the courts until the Committee on Criminal Pattern Jury Instructions adopts an instruction in response to the case:

> To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of this case, including, but not limited to, the following factors:
>
> - the nature and duration of the victim's removal or confinement by the defendant;
>
> - whether the removal or confinement occurred during the commission of separate offenses;
>
> - whether the interference with the victim's liberty was inherent in the nature of the separate offense;
>
> - whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;
>
> - whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and
>
> - whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

*White*, 362 S.W.3d at 580-81.

-18-

Applying the supreme court's *Dixon* analysis to the facts of appellant's case, the trial court denied appellant's request to merge the especially aggravated robbery conviction and the especially aggravated kidnapping conviction. Even in light of the Supreme Court's decision in *White*, we affirm the judgment of the trial court and conclude that the evidence was sufficient to support appellant's conviction of especially aggravated kidnapping.

After reviewing the facts of this case, we conclude that the evidence was legally sufficient for the jury to convict appellant of both especially aggravated kidnapping and especially aggravated robbery, whether the trial court had given the jury the instruction in *White* or the prior standard instruction. Appellant or his accomplice for whom he was criminally responsible cast several blows to the victim's head with a nightstick, rendering her immobile and causing her serious bodily injury. The actions of appellant and Mr. Glover in binding the victim to the bed and leaving her to die far exceed the level of confinement necessary to consummate the offense of especially aggravated robbery. Restraining the victim's hands and feet certainly prevented the victim from summoning help. Although there was a telephone beside her bed, she could not use her hands to reach it. The victim's restraints lessened appellant's risk of detection. Mr. Glover drove through the victim's neighborhood for approximately an hour after leaving the victim's residence, in the victim's car, searching for appellant. Testimony established that the victim subscribed to a "Life Support" or "First Alert" service. Had the victim's liberty not been restrained, the victim could have easily summoned help through that service or by calling 9-1-1. Again, her telephone was in close proximity, but her restraints left her unable to make the emergency call which could have potentially led to detection of the offenders. Had the victim been able to summon emergency responders, the risk of detection would have been great.

Medical testimony established that the restraint on the victim created a significant danger or increased the risk of harm to the victim. Elderly individuals often have less oxygen reserves in their lungs, thereby causing them to breathe in a more shallow manner. The injury to the victim's chest, even without a broken bone, increased the risk of harm in that the victim could have developed pneumonia. Laboratory tests revealed the increased presence of an enzyme that was indicative of the victim's body beginning to digest her heart muscle, the cause of which was lying in the prone position for a significant period of time. The development of this condition presented a significant danger that the victim would sustain kidney damage and kidney failure.

Based on this evidence, the jury convicted appellant of especially aggravated kidnapping and especially aggravated robbery. These facts do not involve an especially aggravated kidnapping in which the victim's removal or confinement was "essentially incidental" to the conduct that constituted the especially aggravated robbery. The offense

of especially aggravated robbery is completed when an offender intentionally or knowingly commits theft of property from another person by violence or by fear and does so with a deadly weapon, causing the victim to suffer serious bodily injury. Tenn. Code Ann. §§ 39-13-401, -403 (2010). The elements of the offense do not include restraint, removal, or confinement. Therefore, we conclude that the evidence was sufficient for the jury to find appellant guilty of especially aggravated kidnapping and especially aggravated robbery beyond a reasonable doubt.

Considering the record developed at trial, we conclude that the confinement of the victim in this case exceeded that which was necessary to consummate the offense of especially aggravated robbery. The evidence in this case is legally sufficient to convict appellant of both especially aggravated robbery and especially aggravated kidnapping pursuant to *White.*

## C. Consecutive Sentencing

Appellant asks this court to review the trial court's imposition of consecutive sentences for his two twenty-four year sentences for especially aggravated robbery and especially aggravated kidnapping. Notably, appellant does not contest the lengths or manner of his sentences, only the consecutive alignment.

We review the trial court's imposition of consecutive sentences de novo. Tenn. Code Ann. § 40-35-401(d) (2010). However, if the record reflects that the trial court properly and adequately considered the statutory sentencing principles and all relevant facts and circumstances, we will attribute a presumption of correctness to the trial court's determinations. *Id.* § -401, Sentencing Comm'n Cmts; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). Appellant bears the burden of showing that imposition of consecutive sentences was improper. *State v. Lane*, 3 S.W.3d 456, 459 (Tenn. 1999) (citing *Ashby*, 823 S.W.2d at 169). Our de novo review consists of an independent review of the trial court's consideration of the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; (7) any statistical information provided by the Administrative Office of the Court as to sentences imposed for similar offenses; and (8) the potential for rehabilitation or treatment. *See* Tenn. Code Ann. §§ 40-35-102, -103, -210 (2010); s*ee also Ashby*, 823 S.W.2d at 168.

A thorough review of the transcript of the sentencing hearing reflects that the trial court properly considered the sentencing principles, as well as all relevant facts and

circumstances, in arriving at appellant's sentence; thus, we presume the trial court's findings to be correct. *See* Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm' Cmts; *Ashby*, 823 S.W.2d at 169 (Tenn. 1991). In determining whether to order appellant to serve his sentences concurrently or consecutively, the trial court found that the appellant "is an offender whose record of criminal activity is extensive" and that appellant "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code. Ann. § 40-35-115 (b)(2), (b)(4) (2010).

In support of the finding that appellant had a record of extensive criminal activity, the State introduced certified copies of appellant's five convictions from Georgia. In reviewing the convictions, the trial court considered only one as a felony conviction for the purpose of establishing appellant's sentencing range. The trial court concluded that appellant was a Range I offender. We do not accept appellant's position that "the court found after extensive review that the Defendant's criminal history only included one prior felony conviction." The trial court did not consider the remaining four convictions as felonies because it was either not evident on the face of the judgments if the convictions would be treated as felonies in Tennessee or the face of the judgment indicated that the offenses would be misdemeanors in Tennessee. Specifically, the Georgia judgments did not reflect the weight of the controlled substances or the intent to manufacture, sell, or deliver the substances, as necessary to distinguish a felony offense from a misdemeanor offense in Tennessee. *Compare* Tenn. Code Ann. § 39-17-417 (2010) *with* Tenn. Code Ann. § 39-17-418 (2010).

The trial court's review of appellant's convictions is not tantamount to a finding that appellant had only one felony conviction on his criminal history. Regardless of the trial court's inability to use the felony convictions to increase appellant's range of punishment, the evidence is germane to supporting the trial court's determination that appellant has an extensive criminal history. *State v. Denise Dianne Brannigan*, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *20 (Tenn. Crim. App. June 13, 2012) (concluding that, outside of the range classification context, no support exists for the proposition that the trial court must analyze the elements of out-of-state offenses to determine the correspondent felony in Tennessee); *State v. Lawrence Hailey*, No. W2009-00759-CCA-R3-CD, 2010 WL 2219574, at *11 (Tenn. Crim. App. May 24, 2010) ("the '24-hour merger rule exception' applies only to the use of prior convictions to determine a defendant's range, not to determine the application of enhancement factor (1)."). *But see* Tenn. Code Ann. § 40-35-106(b)(4) (2010). ("[M]ultiple felonies committed within the same twenty-four-hour period constitute one (1) conviction for the purpose of determining prior convictions."); The burden is on the petitioner to demonstrate to this court that he was sentenced improperly. Tenn. Code. Ann. § 40-35-401 (2010) Sentencing Comm'n Cmts. Appellant has failed to meet the burden of

establishing that the trial court improperly found this factor and that the finding rendered his sentence improper or excessive.

To support consecutive sentencing of a "dangerous offender" pursuant to Tennessee Code section 40-35-115(b)(4), "[t]he proof must . . . establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995). That a crime is "inherently dangerous" does not alone permit consecutive sentences because the law provides for "increased penalties" for such crimes. *Gray v. State*, 538 S.W.2d 391, 393 (Tenn. 1976); *Wilkerson*, 905 S.W.2d at 938.

The nature of the offense itself established that appellant is a dangerous offender with little or no regard for human life. The brutality encompassed by this conviction far exceeds the criteria necessary to establish the element of "serious bodily injury." Further, the record fails to establish that appellant hesitated to commit these crimes that involved a high risk to human life. The evidence supports the trial court's finding of this factor. We note that while the trial court found the existence of two factors supporting the imposition of consecutive sentences, "[t]he presence of a single factor is enough to justify the imposition of consecutive sentencing." *Denise Dianne Brannigan*, 2012 WL 2131111, at *20.

In determining appellant's appropriate sentence, the trial court properly reviewed the sentencing considerations found in the Sentencing Reform Act of 1989. Tenn. Code Ann. § 40-35-103 (2010). The trial court found that extended confinement is necessary to protect the public against further criminal conduct by the appellant. *Id.* at (1)(A). The court also found that appellant had violated orders of probation in the past and has continued to commit crimes. *Id.* at (1)(C). Based upon appellant's lengthy criminal history and the brutality involved in this offense, we agree with the trial court's finding that extended confinement is necessary to protect the public from appellant's further criminal conduct. The evidence received during the sentencing hearing regarding appellant's probation violations further support the trial court's findings.

## CONCLUSION

Discerning no error in the trial court's ruling on the matters of sufficiency of the evidence, merger, and consecutive sentencing, we affirm the judgments of the trial court. Accordingly, relief is denied.

_____
ROGER A. PAGE, JUDGE

-22-